**FILED**

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

United States District Court
Albuquerque, New Mexico

for the

District of New Mexico

Mitchell R. Elfers
Clerk of Court

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1329 Boatright Drive Northeast, Albuquerque, New<br>Mexico 87112 | )<br>)<br>)  Case No.  21-MR-944<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm/ammunition |
| 18 U.S.C. § 1592(a)(1) and (2) | Sex trafficking and benefiting financially from sex trafficking |
| 18 U.S.C. §§ 1962(c), (d) | Racketeer Influenced and Corrupt Organizations Act violations and conspiracy |
| 21 U.S.C. §§ 841(a)(1), 846 | Possession with intent to distribute controlled substances and conspiracy to do the same |
| 21 U.S.C. § 843(b) | Use of a communication facility in furtherance of drug trafficking |

The application is based on these facts:

See attached affidavit, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Mostaghni, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date:  July 12, 2021

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

KIRTAN KHALSA, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

## INTRODUCTION

1.       I, Michael Mostaghni, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search 1329 Boatright Drive northeast Albuquerque, New Mexico 87112 (hereinafter referred to as "FLOYD'S RESIDENCE") and 12931 Central Avenue Northeast Trailer #44 Albuquerque, New Mexico 87123 (hereinafter referred to as the "STASH HOUSE"), both premises collectively as the "TARGET LOCATIONS," a white Kia Soul and maroon Jaguar (herein after referred to as the "TARGET VEHICLES") and digital media devices including phones possessed by or used by Marquez DEZON FLOYD, and for the body of FLOYD to document gang-related tattoos and brands and to collect Deoxyribonucleic Acid ("DNA") samples by way of buccal swabs, as described in further detail herein, and as more specifically described in **Attachment A** (collectively "THE SUBJECT PREMISES").

2.       Marquez DEZON FLOYD (hereinafter referred to as "FLOYD") is a convicted felon, the leader of a gang, and is known to traffic firearms. He resides at FLOYD'S RESIDENCE, is believed to maintain contraband at the STASH HOUSE, is known to drive the TARGET VEHICLES, and is known to operate the Snapchat account "KINGQUEZ2."

3.       Because this affidavit is submitted for the limited purpose of seeking a search warrant for the SUBJECT PREMISES, I have not set forth each and every fact learned during the course of this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested search warrant. As to the evidence sought and information to be searched is described in the following paragraphs and in Attachments A and B, and there is probable cause to believe that the SUBJECT PREMISES as described in

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

**Attachment A** contain evidence, fruits, contraband, and instrumentalities as described in **Attachment B** of violations of:

    a.    18 U.S.C. §§ 1962(c), (d): gang racketeering and drug distribution in violation of (Racketeer Influenced and Corrupt Organizations Act violations and conspiracy);

    b.    18 U.S.C. § 1959 Violent Crime In Aid of Racketeering (VICAR)

    c.    18 U.S.C. § 922(g)(1): felon in possession of a firearm);

    d.    18 U.S.C. § 1951(a)(1)and (2) (sex trafficking and benefiting financially from sex trafficking);

    e.    21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute controlled substances and conspiracy to do the same);

    f.    21 U.S.C. § 843(b) (use of a communication facility in furtherance of drug trafficking).

**RELEVANT FEDERAL CRIMINAL STATUTES**

4.    18 U.S.C. § 922(g)(1) pertains to prohibited persons illegally in possession of firearms based on their status as a felon.

5.    18 U.S.C. § 1962(c) pertains to the Racketeer Influenced and Corrupt Organizations (RICO) Act, which prohibits any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(d) prohibits conspiracies to engage in such conduct.

6.    18 U.S.C. § 1959 Violent Crime In Aid of Racketeering (VICAR) pertains to whoever, as consideration for the receipt of, or as consideration for a promise or agreement

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished.

7.     18 U.S.C. § 1951(a)(1) and (2) prohibits the knowing recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion or any combination will be used to cause that person to engage in a commercial sex act, and benefiting financially from such conduct.

8.     21 U.S.C. § 841(a)(1) prohibits any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C. § 846 prohibits conspiracies to engage in such conduct.

9.     21 U.S.C. § 843(b) states it shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

10.     The aforementioned federal criminal statutes shall hereinafter be referred to as the TARGET OFFENSES.

**AFFIANT'S RELEVANT TRAINING AND EXPERIENCE**

11.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January of 2016. As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am currently assigned to the Violent Crime and Gang Task Force ("VCGTF") at the Albuquerque Field Office of the FBI. I primarily investigate gang-criminal enterprises and drug trafficking organizations involved in the unlawful possession of firearms, distribution of controlled substances, racketeering crimes, human trafficking, and conspiracies associated with these offenses.

12.     My investigative training and experience includes, but is not limited to, the FBI Training Academy at Quantico, Virginia; interviewing subjects, targets, and witnesses; writing affidavits for, and executing search and arrest warrants; managing cooperating sources; collecting evidence; conducting surveillance; and analyzing public records. In addition, I have received advanced training and instruction from state, local, and federal agencies related to gang related crimes, narcotics trafficking, organized crime investigations, money laundering, firearms trafficking, surveillance (both physical and technical), undercover operations, managing federal and local undercover employees ("UCE"), recruiting and managing confidential informants, analyzing financial records and phone records, drafting and serving arrest and search warrants, and issuing subpoenas. Through my training and experience both as an FBI Special Agent and Special Forces Officer (Green Beret), I am familiar with techniques used by criminal actors, Drug Trafficking Organizations ("DTOs"), gangs, and criminal enterprises to traffic controlled

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

substances. I am also familiar with how these individuals conceal the profits of their illegal activities.

13.     As a result of my training and experience, and based on my consultation with other law enforcement officers experienced in investigations regarding Gangs and DTOs, and my knowledge of this investigation, I know that firearms are tools of the trade and instrumentalities of the crime of Gang and Criminal Enterprises, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations—such as the case in this investigation. Additionally, persons trafficking firearms often keep firearms on their person and in their residence for the purpose of deterrence and protection. The firearms they traffic however are often kept at an alternate site, or stash house, in an attempt to avoid detection by law enforcement. I am also aware that when individuals handle firearms and other objects, their DNA is often left behind and is detectable by lab technicians. Conversely, prohibited persons who traffic firearms have been known to wear latex or rubber gloves as an implement to minimize the transfer of their DNA onto contraband.

14.     I am also aware that gang members often bear tattoos and brands representing the gang and criminal enterprise as status symbols or means to demonstrate criminal bonafides. Gang tattoos and brands often tell a story and many of which have specific memories associated with each tattoo or brand. Tattoos and brands also assist gang members while incarcerated as easy to spot sign of belonging to a certain group or groups which often leads to protection from other inmates. Many tattoos and brands are given in prison, again, as a mean to demonstrate affiliation.

15.     I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations—such as the case in this investigation. Additionally, persons trafficking

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

narcotics and humans often keep firearms on their person and in their residence for the purpose of protection considering the dangerous nature of trafficking. Narcotics traffickers often exchange firearms for narcotics or sell them outright as part of the transaction.

16.     Persons engaged in narcotics trafficking often conceal their narcotics, trafficking activities, and firearms as described in the above paragraphs, and proceeds in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have readily available access. These areas include vehicles, car ports, trailers, garages, outbuildings and may be buried underground in an attempt to hide evidence from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. This evidence, which is discussed in detail in the following paragraphs, includes records and evidence of drug transactions, proceeds from drug sales, including United States Currency and other financial instruments, and other valuables obtained from proceeds, and records of racketeering activity.

17.     I am aware that members of gangs and criminal enterprises often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, especially when debts remain open; the status of accounts receivable and accounts payable; the names and phone numbers of suppliers, customers, co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money (U.S. Currency derived from drug trafficking), through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on cellular telephones, computers, and/or on paper, in the form of

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets (drug ledgers), IOU's, miscellaneous notes, money orders, customer lists, and phone address books. I have personally been involved in search warrants which resulted in the discovery of such records that were more than one year old. This type of documentation can be stored on digital media and concealed virtually anywhere.

18.     It has been my experience that individuals involved in human, drug, and illicit firearm trafficking possess items of identification, including but not limited to driver's licenses, rent receipts, bills, and address books. These items are relevant to the identity of the defendant(s), possessor of the items seized, and occupants of the TARGET LOCATIONS, TARGET VEHICLES, and digital devices searched.

19.     I am aware that drug customers frequent drug houses to make purchases and stay for short periods of time before leaving again. The purpose of the short stay is to quickly purchase narcotics and leave in an effort to avoid detection by law enforcement.

### *ELECTRONIC DEVICES AS TOOLS OF ILLICIT FIREARM AND DRUG TRAFFICKING*

20.     As a result of my training and experience, and based on my consultation with other law enforcement officers experienced in investigations regarding Gang and Criminal Enterprises and DTOs, and my knowledge of this ongoing investigation, I know the following:

a.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

b.     The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

telephones.

c. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

d. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, and associated smart phone applications like Snapchat and Instagram have become part of everyday life. This is also true for drug and illicit firearms traffickers. Information stored in electronic form on all of the above devices can provide evidence of drug and firearms trafficking. Individuals who traffic narcotics and firearms frequently use some or all of these devices and associated applications to communicate with co-conspirators, customers, sources of supply, and others involved in the drug and illicit firearm trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of illicit firearms, drug, and human trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

e.    Illicit firearms, drug, and human traffickers often take, or cause to be taken,
photographs and/or videos of themselves, their associates, their property and their
guns, drugs, and victims. They usually maintain these photographs and/or videos on
their person or in their businesses, residences, or cars, on computers, or in the
residences of friends or relatives. Smartphones, tablets, cellular phones, digital
cameras, and other digital devices often have the capability to take still photos and
videos and save them indefinitely on the device's storage medium. Drug and
firearms traffickers frequently use these devices to take and store their photographs
and videos, and to host the smartphone applications on which they will advertise
and communicate about their illicit sales using both text and images.

f.    Illicit firearms, drug, and human traffickers often utilize digital video surveillance
systems. A digital video surveillance system is a surveillance system that is capable
of capturing images, videos, and audio that can be compressed, stored or sent over
communication networks. I know that it is common for digital surveillance systems
to contain storage media that allow for 30 days or more of camera footage to be stored
on the system. Digital video surveillance systems can be used for nearly any
environment, including a commercial business or residence. I know that drug
traffickers make use of video surveillance systems to monitor who is approaching
their residence and assess whether the person presents a threat to the trafficker's drugs
or drug proceeds. Drug and illicit firearms traffickers also utilize surveillance
equipment to obtain advance notice when law enforcement arrives to hide or destroy
evidence of criminal activity. However, given the constant recording that occurs with
a digital surveillance system, it is also common that the digital video surveillance

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

system will also depict evidence of the residents' illicit firearms and drug trafficking activities and conversations related to illicit firearms and drug trafficking.

g. Persons trafficking firearms, narcotics, and humans often employ numerous cell phones as a means to communicate with drug suppliers and drug customers. Oftentimes, various phone numbers are utilized at the same time in an effort to avoid law enforcement monitoring. I have observed persons involved in drug trafficking use messaging applications and pre-paid phones requiring no subscriber information, and even use fictitious names, or the names of others, to register the cellular phones used to advance their unlawful activities and to disguise their illegal activity and avoid law enforcement detection. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further illicit activities, photographs and videos of controlled substances, victims (for sale or transport), drug proceeds, and/or firearms. A search of digital devices may yield additional evidence related narcotics trafficking in the form of text messages, instant messaging, pictures, emails, voicemails, ledgers, videos and other digital media or smart phone applications employed to evade law enforcement detection. Many of these digital applications may be used on computers/laptops and tablets. Furthermore, digital devices may require deeper examination of all the stored data to locate and determine which particular files or information constitute evidence or instrumentalities of a crime.

### *ELECTRONIC DEVICES AS TOOLS OF SEX AND HUMAN TRAFFICKING*

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

21.    Based on my training and experience, and that of more experienced law enforcement officers who specialize in human trafficking investigations, computer-based crimes, and sex trafficking investigations, I know the following:

      a. Computers and computer technology, including cellular phones, have revolutionized the human trafficking industry. In general, computers, including cellular phones, serve several functions in connection with human trafficking offenses: advertisement, communication, and coordination.

      b. Persons engaged in human and sex trafficking offenses often use the Internet, smartphone applications, computer technology, and cellular phones as tools to do so. The Internet, and cellular phones that can connect to the Internet, offer several different avenues for communication, as well as venues for advertising and coordinating commercial sex acts.

      c. Persons engaged in human and sex trafficking offenses often use online resources, smartphone applications, and cellular phones to meet and communicate other like-minded individuals. The Internet and cellular phones afford such persons opportunities to communicate with social media websites, text messaging, and applications (some which provide encryption of a user's data) to further their crimes.

      d. Persons who are engaged in commercial sex trafficking often use the Internet, smartphone applications, and cellular phones to contact and meet and recruit their victims, to conduct financial transactions in furtherance of their crimes, to coordinate transportation for victims between a network of offenders, and more.

### COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.    As described above and in Attachment B, this application seeks permission to

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

search for evidence and records that might be found at the TARGET LOCATIONS and

TARGET VEHICLES, in whatever form they are found. Much of the evidence and records

described in the paragraphs above, and in Attachment B, can also be produced and/or stored on

computers, digital media and other storage media. For this reason, I submit that if a computer,

digital medium, or storage medium is found at the SUBJECT PREMISES, TARGET

VEHICLES, or on the body of FLOYD there is probable cause to believe those records will be

stored on that computer or storage medium. Thus, the warrant applied for would authorize the

seizure of electronic storage media or, potentially, the copying of electronically stored

information, all under Rule 41(e)(2)(B).

    23.    *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the TARGET LOCATIONS and TARGET

VEHICLES, it is sometimes possible to make an image copy of storage media.  Generally

speaking, imaging is the taking of a complete electronic picture of the computer's data, including

all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the

accuracy and completeness of data recorded on the storage media, and to prevent the loss of the

data either from accidental or intentional destruction.  This is true because of the following:

        a.   The time required for an examination. As noted above, not all evidence takes the

            form of documents and files that can be easily viewed on site.  Analyzing

            evidence of how a computer has been used, what it has been used for, and who

            has used it requires considerable time, and taking that much time at the could be

            unreasonable. Storage media can store a large volume of information.  Reviewing

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

that information for things described in the warrant can take weeks or months,
depending on the volume of data stored, and would be impractical and invasive to
attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways,
featuring a variety of different operating systems, application software, and
configurations.  Therefore, searching them sometimes requires tools or knowledge
that might not be present on the search site.  The vast array of computer hardware
and software available makes it difficult to know before a search what tools or
knowledge will be required to analyze the system and its data at the TARGET
LOCATIONS and TARGET VEHICLES.  However, taking the storage media
off-site and reviewing it in a controlled environment will allow its examination
with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be
stored in a variety of storage media formats that may require off-site reviewing
with specialized forensic tools.

24.    *Nature of examination.*  Based on the foregoing, and consistent with Rule
41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying
computers and/or storage media that reasonably appear to contain some or all of the evidence
described in the warrant, and would authorize a later review of the media or information
consistent with the warrant.  The later review may require techniques, including but not limited
to computer-assisted scans of the computer or entire medium, that might expose many parts of a
hard drive to human inspection in order to determine whether it is evidence described by the
warrant.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

## **BACKGROUND**

25.     Over the past 20-months, the FBI Safe Streets Gang Task Force (SSGTF) (now the VCGTF), Albuquerque Police Department Gang Unit ("APD"), Drug Enforcement Administration ("DEA"), and Second Judicial District Attorney's Office in Bernalillo County (DA's Office) have been investigating two interrelated Bloods street gangs in Southeast Albuquerque, New Mexico. The first gang is the "Kirk Town Piru," which also go by the name "Hoodlitt Piru" (hereinafter "KTP") and the second Bloods gang is "Tha Firm" or "Tha Firm Family Movement" (hereinafter "TF"). Both gangs are aligned with the Bloods, a nationwide street gang that originated in Los Angeles, California. The Bloods are involved in drug trafficking, robbery, and murder, among other criminal activities. The Bloods are predominately comprised of African American members and associated with the color red. The Bloods are known for their rivalry with the Crips, who associate with the color blue and also hale from Los Angeles.

26.     The KTP/TF generally operate along the outskirts of the Kirtland Air Force Base in Southeast Albuquerque. The particular region in which the KTP/TF operate is often referred to as the "Kirk" in street parlance and is synonymous with the Kirtland Community, which is composed of a residential area generally bounded by Gibson Boulevard to the north, Sunport Boulevard to the south, Interstate 25 to the West, and Yale Boulevard to the east.

27.     Data collected by the APD Real Time Crime Center and the DA's Office pertaining to shootings in Albuquerque during 2019 indicated KTP/TF members and associates were responsible for approximately 27% of the gang-related shootings. Similarly, KTP/TF members and associates were responsible for 22% of gang-related shootings that resulted in injury in Albuquerque in 2019. According to APD and the DA's Office, no other Albuquerque criminal element had committed such a large percentage of shootings in recent history.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

28.     Investigators with the FBI, APD, DEA, and DA's Office have been working together to investigate a series of KTP/TF related shootings and homicides, to include the May 2019 murder of a University of New Mexico baseball player. The investigative agencies have been monitoring the activities of the KTP/TF via public social media posts by their members and associates, undercover law enforcement social media platforms, confidential human sources, cooperating defendants, recorded jail calls, and other surveillance methods. FBI agents executed several federal search warrants on the residences and vehicles of KTP/TF members and associates over the past 20 months and recovered significant quantities of cocaine, heroin, methamphetamine, and firearms. Based on my knowledge of KTP and TF, which is informed by the investigation and cooperating sources who are member and associates of KTP and TF, I believe that KTP and TF engage in, *inter alia*, drug trafficking, illicit firearms trafficking, and human trafficking, for the financial benefit of the group, for the purpose of promotion within the group, or for the purpose of protecting and perpetuating the group.

**TARGET SUBJECT**

29.     **MARQUEZ DEZON FLOYD,** aka: "Quez," aka: "Don Honest Corleone," aka: "Honest;" is a Blood gang member who identifies as a PIRU (Blood Set), a leader within KTP, and the self-appointed leader of TF. FLOYD is believed to be involved in a variety of criminal activities including narcotics trafficking, firearms trafficking, human trafficking, and racketeering activity such as robberies and assaults. The specific facts and circumstances supporting the allegations against FLOYD are outlined in the paragraphs that follow.

30.     Intelligence reporting indicated that FLOYD promoted the primary suspect in the murder of Jackson Weller and the reported leader of the KTP, Darian BASHIR, to the rank of General within TF following Weller's murder. Reporting indicates FLOYD promoted BASHIR so

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

that he would have some criminal bonafides while incarcerated, suggesting the promotion to the rank of General for the alleged murder was a thing of value. The investigation into the murder of Jackson Weller is ongoing.

     31.    I am aware through my review of New Mexico Court records, law enforcement data bases, and discussions with other law enforcement officials that FLOYD is a felon with convictions for the following crimes of violence for which he served more than 365 days incarceration:

        a.  Armed robbery by guilty plea on or about June 25, 2010 in the Second Judicial District Court of New Mexico, cause number D-202-CR-2009-03932

        b.  Aggravated battery with a deadly weapon by guilty plea on or about June 25, 2010 in the Second Judicial District Court of New Mexico, cause number D-202-CR-2009-03932.

FLOYD was sentenced to four years in the NM Department of Corrections for these offenses.

     32.    In addition to his felony convictions, FLOYD has misdemeanor convictions for:

        a.  Aggravated Battery by plea on or about October 7, 2009 in the Ninth Judicial District Court of New Mexico, cause number D-0905-CR-200900520;

        b.  Resisting, Evading or Obstructing an Officer by plea on or about October 7, 2009 in the Ninth Judicial District Court of New Mexico, cause number D-0905-CR-200900569.

     33.    In additional to his convictions, FLOYD was also arrested for:

        a.  Criminal Sexual Penetration of a 6-year-old as minor in June 2004: Clovis Police Incident Report Number 2004004405-0;

        b.  Burglary, Larceny, Tampering with Evidence, and Conspiracy to Commit a Crime: D-905-JR-2008-00004;

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

    c.  Larceny: M-12-MR-2008-00741;

    d.  Aggravated Battery: M-12-FR-2009-00270; and

    e.  Resisting, Evading, Obstructing an Officer; Possession of Marijuana: M-12-MR-2009-00543.

    34.    Law enforcement and jail records indicate FLOYD has the following TF and KTP related tattoos on his body: "PIRU" on his chest, "Blood" on his right hand, "FIRM Family" on his right calf, and "THA FIRM FAMILY" accompanied by a "B" for BLOOD on his back:

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT



AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

35.     I am seeking the court's permission to utilize law enforcement photographers to photograph and document the FLOYD's tattoos. Such photo documentation would help positively identify subjects and better document and determine FLOYD's gang affiliation, which is evidence of membership in a criminal enterprise.

**THE CURRENT INVESTIGATION**

36.     The Confidential Human Source: FBI Confidential Human Source ("CHS") had been an active FBI informant for more than a year. While working as an informant, the CHS introduced an undercover agent to targets of an FBI investigation and provided intelligence information that resulted in the issuance of at least three federal search warrants and the seizure of controlled substances, firearms and drug proceeds. The CHS is motivated to assist law enforcement reduce violent crime in Albuquerque and prevent young people from joining gangs. The CHS has received approximately $6,750 in financial assistance from the FBI and has prior felony convictions for trafficking a controlled substance, possession of a controlled substance, tampering with evidence, battery and aggravated assault. I consider information from the CHS to be reliable because much of it was corroborated through law enforcement investigation and other source reporting. To my knowledge, the CHS's information has not been found to be false or misleading.

37.     In March of 2021 the CHS spoke with agents about FLOYD. The CHS knows FLOYD to be a member of the Bloods and a distributor of various controlled substances. The CHS told agents FLOYD utilized Facebook Messenger and the Snapchat profile "KINGQUEZ2" to broker drug and firearms transactions with his clientele. The CHS provided FBI agents with the Facebook and Snapchat users names that FLOYD utilizes and those of others with whom he interacts. At the direction of the FBI, the CHS has maintained ongoing communications via Facebook and Snapchat with FLOYD regarding the purchase of contraband, specifically firearms.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

The communications remain active and the CHS has been encouraged to maintain contact with FLOYD via Facebook and Snapchat. The CHS has also observed FLOYD discuss drug sales and gang activities with other persons via Facebook and Snapchat. The CHS reported FLOYD and other members of the KTP/FIRM utilize "flip phones" or "burner phones" and switch their phone number frequently. The CHS said FLOYD and other KTP members believe federal agents are monitoring their cellular telephones and that is why they switch numbers frequently. The CHS reported KTP members believe their Facebook Messenger and Snapchat accounts to be secure and free from law enforcement monitoring. As such, FLOYD has maintained the same accounts for a long period of time.

38.     In October 2020, the CHS reported that FLOYD claimed to be out of the trafficking business but was still possibly selling drugs and firearms. FLOYD offered to procure a firearm and fentanyl pills if the CHS needed. Additionally, FLOYD offered the CHS his services to collect debts on behalf of the CHS for a fee.

39.     In March 2021, FLOYD contacted the CHS via his Snapchat account with videos of the what the CHS believed to be an AK-47 assault rifle.

40.     The Cooperating Defendants: FBI agents have spoken with three Cooperating Defendants ("CD-1," "CD-2," and "CD-3") who are KTP/FIRM members or associates and know FLOYD well. All three Cooperating Defendants provided FBI agents with significant details about the KTP/FIRM gang and FLOYD.

41.     Cooperating Defendant 1 ("CD-1") is currently facing felony drug and firearm charges and voluntarily spoke with FBI agents. CD-1 began as a CHS for the FBI, but was arrested for federal drug and firearms offenses during the course of his cooperation, but was re-activated as a cooperating defendant. CD-1 is a KTP associate, and has known FLOYD for almost two years.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

CD-1 has assisted KTP members distribute controlled substances over the years. CD-1 knew FLOYD to sell controlled substances and utilize Snapchat to advertise the sale of drugs, as well as post photos of drugs, firearms, and FIRM related messages. CD-1 said FLOYD utilized Snapchat to set up drug deals, to include the price, quantity of drugs, and location of drug transactions. CD-1 provided FBI agents with the Snapchat user names for FLOYD.

42.     In August 2020, FLOYD agreed to sell CD-1 powder cocaine, fentanyl pills, and also offered to "rock up" or "re-rock" powder cocaine. In my training and experience, the phrase "rock up" means cook powder cocaine into crack cocaine; and "re-rock" means cut the powder cocaine with mixing agents to increase the quantity and decrease the purity.

43.     In February 2021, at the direction of the FBI, CD-1 arranged a firearm and drug transaction via Snapchat with FLOYD. FLOYD agreed to provide powder cocaine and a firearm in exchange for a specified amount of US Currency. FBI Agents did not execute the operation because the former CHS was arrested for violating terms of supervised released the day the transaction was planned, and became CD-1.

44.     In February 2021, CD-1 reported FLOYD was known to "pimp" girls and although FLOYD may not "buy" a girl, would assist in her trafficking. CD-1 was unfamiliar with the specifics of human trafficking, however indicated FLOYD and other members of KTP/FIRM had previously pimped girls in partnership. I understand the term "pimp" to mean a person who supervises prostitutes, traffics humans for commercial sexual acts, and receives the profits for those acts under the threat of fraud, force, or coercion.

45.     Cooperating Defendant 2 ("CD-2") is currently facing felony firearm charges and voluntarily spoke with FBI agents. CD-2 is is a KTP/FIRM member/associate and has known FLOYD for several years. CD-2 provided agents with background information on the KTP, to

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

include the gang's recruitment efforts, philosophy, rules, communication methods, membership and criminal activities. CD-2 provided details on recent violent crimes perpetrated by KTP members, which are being investigated by law enforcement. In February of 2021, CD-2 told agents FLOYD utilized Snapchat to discuss gang business, which included drug acquisition and distribution.

46.     Cooperating Defendant 3 ("CD-3") is currently facing a felony firearm charge and voluntarily spoke with FBI Agents. CD-3 is a KTP/FIRM associate and knew FLOYD to be the leader of the FIRM and to be a shot caller among the KTP. CD-3 provided agents with background information on the KTP, to include the gang's recruitment efforts, philosophy, rules, communication methods, membership and criminal activities. CD-3 provided details on recent violent crimes perpetrated by KTP members, which are being investigated by law enforcement. CD-3 reported that approximately five years ago, BASHIR and FLOYD were involved in a gang-related shooting where BASHIR used a Taurus 9mm with a green laser attachment, and an extended 30-round magazine that CD-3 reported FLOYD sold to BASHIR.

### *UNDERCOVER LAW ENFORCEMENT OBSERVATIONS*

47.     In August of 2020, FLOYD sold a firearm to an undercover agent with the Bureau of Alcohol, Tobacco, and Firearms.

48.     Members of the investigative agencies (FBI, APD and the DA's Office) maintain undercover social media accounts, to include Facebook and Snapchat. Agents have confirmed FLOYD is utilizing several social media accounts, and have monitored some of FLOYD's Facebook and Snapchat activity.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

49.   In May 2021, FLOYD communicated with an undercover agent from the New Mexico State Police ("NMSP") about purchasing firearms. During those interactions, FLOYD negotiated pricing for an AR15 assault rifle.

### *SNAPCHAT PRODUCTION*

50.   In May 2021, FBI Agents served Snapchat a Federally authorized Search Warrant for content related to FLOYD'S Snapchat account, "KINGQUEZ2" and received numerous chats, pictures, posts, and media indicative firearms, narcotics, and human trafficking. In that return, agents observed many pictures of FLOYD which appear to be taken by FLOYD, as well as conversations where others identify him as Marquez Dezon Floyd. I also know Floyd to go by the nickname "Quez," a shortening of his first name, Marquez. I know Snapchat to be a smartphone application, and therefore that FLOYD likely accesses and stores Snapchat information on a cellular device which he carries on or near his person.

### *Illicit Firearms Trafficking*

51.   On March 17, 2021, FLOYD sent a message to the Snapchat profile "mr5509930" asking, "Any straps up." In my training and experience I understand the term "strap" to mean firearm and I believe this post from FLOYD to mr5509930 to mean, "do you have any guns?"

52.   On March 31, 2021, FLOYD interacted with "noahj240" via Snapchat and posted the below picture:

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT



The posted picture depicts what appears to be four firearms, including an AR-15 style assault rifle with drum magazine. The posted chat reads from "noahj240" to FLOYD: "Dame nigga u going to war my nigga" to which FLOYD replies, "yes."

53.     On March 31, 2021, FLOYD appeared to traffic firearms via Snapchat. That conversation, and my interpretation of its meaning, follows:

| SENDER | TEXT | INTERPRETATION |
|---|---|---|
| lokegame | A sell me yo fn go 750 | sell me your FN (a brand of firearm) for $750 |
| kingquez2 | I need 8 lil blood | I need $800, young blood-gang member. |
| kingquez2 | 3 clips attachments and bullets | I'll include 3 magazines, assorted attachment extras, and the associated ammunition. |
| lokegame | U can kee some clips and attachments I just need one clip | You can keep the extra magazines – I only need one magazine. |
| kingquez2 | Ok | Okay. |

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

54.     Between November 2020 and March 2021 FLOYD posted dozens of pictures of what appear to be firearms and ammunition that included AR-15 style assault rifles, Ak47 style rifles, pistols, extended magazines, and drum magazines, one of which depicts the serial number of the firearm. Depicted below are several examples of such postings:

a.     November 1, 2020:



i.



ii.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT



iii.



iv.

b.      November 29, 2020:

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT



i.

c.     March 30, 2021:



i.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT



ii.

55.     Within the last 12 days, FBI investigators received a tip that FLOYD posted

multiple firearms for sale that included AR-15 style rifles and Ak-47 style rifles. Pictures of the

sale firearms included what appeared to be ammunition. In my training and experience, I have

not encountered fake ammunition.

### *Narcotics Trafficking*

56.     On January 29, 2021 FLOYD sent a message to "smilezbebangin" asking, "Lmk

who need snow." In my training and experience I understand "Lmk" to mean "let me know" and

I understand the term "snow" to mean powder cocaine. I understand the phrase to mean, "who

needs powder cocaine" which is suggests FLOYD is able to provide powder cocaine to those

who need it.

57.     In February 2021, FLOYD interacted with a Snapchat profile "marcpate" where

they discuss what appears to be narcotics trafficking and FLOYD lists off the types and

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

quantities of pills he gave to "marcpate." That conversation, and my interpretation of its

meaning, follows:

| SENDER | TEXT | INTERPRETATION |
|---|---|---|
| kingquez2 | Those are 50s my bad | Those are illicit pills (of an unknown type), my apologies. |
| kingquez2 | Next time i come.well have better shit | Next time, I have better/correct products. |
| marcpate | Ok bro bet I'm about to count everything and all that so I know exactly what I have | Ok sounds good. I will count everything to know what I have on hand. |
| kingquez2 | Thats just a quick start up | What I gave you is a sample but there is more available. |
| kingquez2 | It should be like 20 x | This is what you should have: 20 ecstasy pills |
| kingquez2 | 11 bars | 11 bars of Xanax |
| kingquez2 | And 5 50s | and 5 illicit pills (of an unknown type) |
| kingquez2 | Do thet make yall wait 3 day when u by the gun | Do legitimate firearms distributors make you wait 3 days before you purchase a firearm? |
| marcpate | No | No. |
| marcpate | Where depends they can it's random sometimes you can go in there and get it within 5 minutes sometimes they put a hold on it | Where depends they can it's random sometimes you can go in there and get it within 5 minutes sometimes they put a hold on it |

The parties discussed firearms and FLOYD asked if the state makes customers wait a period of

three days before purchasing a firearm. Considering FLOYD is a prohibited person, investigators

believe FLOYD is attempting to gauge if marcpate can legally purchase firearms.

### *Human Trafficking*

58.    In September 2020 FLOYD interacts with "karinajuliet20" via Snapchat and tells

her he's a "P" which I understand to mean "pimp." That conversation, and my interpretation of

its meaning, follows:

| SENDER | TEXT | INTERPRETATION |
|---|---|---|
| karinajuliet20 | 200 for one night stand 150 for no limit sex 100 for normal hook up | Here are my prices for various sex acts. |

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

|  | 100 for blowjob Which price do you wanna go for  ? |  |
|---|---|---|
| kingquez2 | I don't buy pussy | I don't pay for sex. |
| kingquez2 | Females pay me | Women pay me for sex. |
| karinajuliet20 | Lol | Laugh out loud. |
| karinajuliet20 | Why are they pay you | Why do women pay you for sex? |
| kingquez2 | Cause ima p | Because I'm a pimp. |
| kingquez2 | Plus ima giggalo | Plus I'm attractive and sexually desirable. |
| karinajuliet20 | Ok | Ok. |
| kingquez2 | We can get money together | We can go into business together where I can be your pimp and we will both make money. |

Based on my training and experience, and the training and experience of investigators who focus

on human trafficking investigations with whom I have spoken, this conversation is indicative of

FLOYD attempting to recruit a sex worker to commit commercial sex acts with others for him.

59.    In October 2020, FLOYD interacted with "ft.lovelydivine" via his Snapchat

account where he again calls himself a "P" and goes into further detail about the enterprise. That

conversation, and my interpretation of its meaning, follows:

| SENDER | TEXT | INTERPRETATION |
|---|---|---|
| kingquez2 | Because the hardest thing about being a p is knockin a bitch that believes in her p and bring the money back | The most difficult thing about being a pimp/human trafficker is physically hitting a woman that trusts her pimp/trafficker and yet she still brings money back to the pimp/trafficker despite being physically abused. |
| kingquez2 | You should be investing in me daily | You should bring me money daily as an investment in our business. |
| kingquez2 | 3 hundred should be the mark daily | $300 per day at least. |
| kingquez2 | And you should work to exceed that and bring as much as possible so I can double that | And you should do as much as you can to bring in more so I can double profits through other illicit means. |
| kingquez2 | But good morning baby did you shave and clean everything like I said | But good morning baby did you shave and clean your genital areas like I told you too? |

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

| kingquez2 | And are u ok I saw all them lil boys running at you last night | It appeared as though lots of prospective customers were interested in you last night. |
|---|---|---|
| kingquez2 | Ok I love you | Ok I love you |
| kingquez2 | Tell these nighas you honest bottom bitch | Tell these people you are my prostitute that I rely on to keep my other prostitutes in line. |
| ft.lovelydivine | Ok daddy 🥰🥺 | Okay pimp. |

Based on my training and experience, and the training and experience of investigators who focus on human trafficking investigations with whom I have spoken, this conversation is indicative of a sex trafficking relationship perpetuated by physical violence.

**SURVEILLANCE OPERATIONS**

60.     FLOYD'S RESDENCE: 1329 Boatright Drive northeast Albuquerque, New Mexico 87112

      a.  During multiple surveillance operations in April and May of 2021, investigators observed FLOYD present at, departing from, and returning to, FLOYD'S RESIDENCE. Agents and detectives positively identified FLOYD driving a white Kia Soul bearing New Mexico license plate AZHB98. The Kia is registered to Breanna JOHNS at 1513 Spence Street Southeast Albuquerque, New Mexico 87108, a residence located in the "Kirk."

      b.  Investigators also observed a maroon Jaguar sedan present at FLOYD'S RESIDENCE bearing New Mexico license plate BADB46 registered to JOHNS and FLOYD at the Spence address in the "Kirk." Investigators observed FLOYD drive the maroon Jaguar during surveillance operations in June of 2021.

      c.  During the period of April to July 2021, investigators executed multiple spot checks on FLOYD'S RESIDENCE during early morning hours and late evening hours and observed the Kia at FLOYD'S RESIDENCE.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

61.     STASH HOUSE: 12931 Central Avenue Northeast Trailer #44 Albuquerque,

New Mexico 87108.

    a.   While investigators observed FLOYD during the aforementioned surveillance

        operations, they noted he travelled to the STASH HOUSE, and entered a maroon

        minivan bearing New Mexico license plate 839WJT with an unknown male and is

        registered to the STASH HOUSE address. The characteristics of STASH HOUSE

        were noteworthy to investigators: the trailer maintained a robust surveillance

        system common of stash houses that covered all avenues of ingress to the trailer,

        including a view of the pedestrian gate accessing the curtilage; the trailer

        maintained a six-foot privacy fence that completely obscured the view of the front

        yard and entry point; and the trailer is located in a high crime and high violence

        area of the city. Based on my training and experience, the characteristics of the

        STASH HOUSE are common among off-site locations that individuals engaged in

        narcotics and firearms trafficking employ to evade detection by law enforcement.

    b.   On July 7, 2021 your affiant and Detectives with the APD Gang unit observed

        FLOYD, a male believed to Paul TAFOYA, and an unknown juvenile male in

        front of the STASH HOUSE near a green and primer in color Chevy or GMC

        SUV bearing New Mexico license plate AFJM02. Detectives queried the license

        plate and learned it was registered to TAFOYA at the STASH HOUSE however

        was assigned to a white, 2010 Dodge. Detectives also noted that the STASH

        HOUSE appeared to contain 5-6 dog kennels in the front yard. Investigators know

        FLOYD to breed and sell "bully" breed dogs via his publicly available Facebook

        accounts. Additionally, Detectives observed a black male adult in his 30s who

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

wore dreadlocks, working on the kennels. The observed male's description
matched that of FLOYD. Eventually, the three males entered the Chevy or GMC
SUV and departed the trailer park and your affiant was able to positively identify
FLOYD as the passenger of that vehicle. The Chevy or GMC SUV returned a
short time later after a trip to McDonald's restaurant.

## SEARCHING FOR GANG TATTOOS:

62.     When the search warrants are executed, agents will attempt to interview FLOYD
about his affiliation with KTP, TF, and any other violent street gangs. I believe gang tattoos to be
significant evidence of gang affiliation and such tattoos may constitute an overt act, in-so-much-
as gang-specific tattoos enable a person to maintain or increase their position within the gang. I
noted and successfully charged several gang members with overt acts, within the context of a
RICO conspiracy, for having one or more gang tattoos.

63.     It has been my experience that many people lie when speaking with law
enforcement and will sometimes go to great lengths to conceal their gang ties. Furthermore, the
persons to be searched may exercise their constitutional right to refrain from speaking with law
enforcement agents. In an effort to discern and document FLOYD's gang affiliation, I am
requesting law enforcement agents be permitted to search the FLOYD above the waist and below
the thighs for tattoos.

64.     I am aware that KTP members have distinct tattoos that represent their dedication
to the KTP criminal enterprise. Furthermore, I know that FLOYD has tattoos documenting his
loyalty to TF. I know members to display these tattoos to gain respect within the enterprise and
to intimidate non-members.

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

65.     I am aware that some of the tattoos evidencing membership in or association with

the KTP include but are not limited to: the words "Blood," "Piru," "Kirk," "Firm," and the letters

"P," and "B."

66.     I am seeking the court's permission to photograph and document such tattoos, as

they will help positively identify FLOYD's membership and better document and determine their

gang affiliation.

## BIOMETRIC ACCESS TO DEVICES

67.     I am aware gang members utilize cellular telephones to exchange information,

photographs, and felonious communications, to include the names and locations of informants,

witnesses, victims. I have also observed gang members discuss the status of gang members (i.e.,

who is "good" or who has been greenlit) and which members have drugs for sale. I have also

observed gang members discuss the acquisition and distribution of firearms to and from other

members, as well as discussions about gang related murders and assaults.

68.     I know from my training and experience investigating gangs and drug trafficking

organizations that cellular telephones contain evidence of criminal conduct. More specifically, it

has been my experience that cellular telephones are utilized to communicate drug prices,

availability, quantity, and the contact information for customers and suppliers. I have also

discovered photographs of controlled substances on cell phones,

        a.  I know from my training and experience, as well as from information found in

publicly available materials published by device manufacturers, that many

electronic devices, particularly newer mobile devices and laptops, offer their users

the ability to unlock the device through biometric features in lieu of a numeric or

alphanumeric passcode or password. These biometric features include fingerprint

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

scanners, facial recognition features and iris recognition features. Some devices

offer a combination of these biometric features, and the user of such devices can

select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints. For example, Apple offers a

feature called "Touch ID," which allows a user to register up to five fingerprints

that can unlock a device. Once a fingerprint is registered, a user can unlock the

device by pressing the relevant finger to the device's Touch ID sensor, which is

found in the round button (often referred to as the "home" button) located at the

bottom center of the front of the device. The fingerprint sensors found on devices

produced by other manufacturers have different names but operate similarly to

Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the

ability to unlock the device through his or her face. For example, this feature is

available on certain Android devices and is called "Trusted Face." During the

Trusted Face registration process, the user holds the device in front of his or her

face. The device's front-facing camera then analyzes, and records data based on

the user's facial characteristics. The device can then be unlocked if the front-

facing camera detects a face with characteristics that match those of the registered

face. Facial recognition features found on devices produced by other

manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the

ability to unlock the device with his or her irises. For example, on certain

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

Microsoft devices, this feature is called "Windows Hello." During the Windows

Hello registration, a user registers his or her irises by holding the device in front

of his or her face. The device then directs an infrared light toward the user's face

and activates an infrared-sensitive camera to record data based on patterns within

the user's irises. The device can then be unlocked if the infrared-sensitive camera

detects the registered irises. Iris-recognition features found on devices produced

by other manufacturers have different names but operate similarly to Windows

Hello.

e.  In my training and experience, users of electronic devices often enable the

aforementioned biometric features because they are considered to be a more

convenient way to unlock a device than by entering a numeric or alphanumeric

passcode or password. Moreover, in some instances, biometric features are

considered to be a more secure way to protect a device's contents. This is

particularly true when the users of a device are engaged in criminal activities and

thus have a heightened concern about securing the device.

f.  As discussed in this Affidavit, I have reason to believe that one or more digital

devices will be found during the search. The passcode or password that would

unlock the devices subject to search under this warrant currently is not known to

law enforcement. Thus, law enforcement personnel may not otherwise be able to

access the data contained within the devices, making the use of biometric features

necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found

in publicly available materials including those published by device manufacturers,

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

that biometric features will not unlock a device in some circumstances even if
such features are enabled. This can occur when a device has been restarted,
inactive, or has not been unlocked for a certain period of time. For example,
Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours
has elapsed since the device was last unlocked; or, (2) when the device has not
been unlocked using a fingerprint for 8 hours and the passcode or password has
not been entered in the last 6 days. Similarly, certain Android devices cannot be
unlocked with Trusted Face if the device has remained inactive for four hours.
Biometric features from other brands carry similar restrictions. Thus, in the event
law enforcement personnel encounter a locked device equipped with biometric
features, the opportunity to unlock the device through a biometric feature may
exist for only a short time.

h.  Due to the foregoing, if law enforcement personnel encounter any devices that are
subject to seizure pursuant to this warrant and may be unlocked using one of the
aforementioned biometric features, I request permission to: (1) press or swipe the
fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the
devices found at the Subject Premises; (2) hold the devices found at the Subject
Premises in front of the face of Target Subjects and activate the facial recognition
feature; and/or (3) hold the devices found at the Subject Premises in front of the
face of Target Subjects and activate the iris recognition feature, for the purpose of
attempting to unlock the devices in order to search the contents as authorized by
this warrant. The proposed warrant does not authorize law enforcement to request
that Target Subjects state or otherwise provide the password or any other means

AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION**

69.     Based on the details contained herein, I believe there is evidence, fruits, and instrumentalities related to the SUBJECT PREMIES and respectfully submit there is probable cause to search for evidence at those locations.

70.     This affidavit was approved by Assistant United States Attorney Alexander M.M. Uballez.

Respectfully submitted,

Michael Mostaghni
FBI Special Agent

Subscribed and sworn to telephonically and submitted electronically on July 12, 2021:

HONORABLE KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

FLOYD'S RESIDENCE is located at 1329 Boatright Drive Northeast Albuquerque, New Mexico 87112.

The property may be described as a single-story home with tan stucco exterior and a white door located on the front face of the residence. The address numbers, "1329" are visible from the street on the curb. The back yard is accessed by a pedestrian gate on the northwest corner of the residence. There are multiple vehicles present at FLOYD'S RESIDENCE, including the TARGET VEHICLES and a maroon, Ford SUV that has been observed parked on the street and in the yard in front of the residence. The search is to include all rooms, attachments, storage containers, out buildings, and vehicles that can reasonably be associated with FLOYD'S RESIDENCE.





**ATTACHMENT B**

**ITEMS TO BE SIEZED**

Items to be seized: All evidence, fruits, and instrumentalities of violations of: 18 U.S.C. §§ 1962(c), (d):

gang racketeering and drug distribution in violation of (Racketeer Influenced and Corrupt Organizations

Act violations and conspiracy); 18 U.S.C. § 1959 Violent Crime In Aid of Racketeering (VICAR); U.S.C. §

922(g)(1): felon in possession of a firearm); 18 U.S.C. § 1951(a)(1)and (2) (sex trafficking and benefiting

financially from sex trafficking); 21 U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute controlled

substances and conspiracy to do the same); 21 U.S.C. § 843(b) (use of a communication facility in

furtherance of drug trafficking).to include the following items:

1. Evidence of membership or affiliation with the FIRM/KTP violent gang: to include any documents, photographs, drawings, writings, or objects depicting gang members names, initials, logos, monikers, slogans, or any item depicting potential gang membership, affiliation, activity or identity; "green light" lists, murder/assault lists, address and telephone number lists, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports or printouts, legal documents, detention facility inmate number lists or addresses for inmates or detention facilities;

2. Firearms, magazines, ammunition, holsters and items used to store firearms;

3. Controlled substances, drug packaging material, paraphernalia and scales;

4. United States currency;

5. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders money order receipts, pre-paid money cards such as MoneyPak, Green Dot, Wal-Mart, or other debit cards and any documents relating to transporting, ordering, purchasing or distributing drugs;

6.  Cellular telephones and other digital devices, such as computers, laptops, tablets, PDAs or similar electronic storage devices;

7.  Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

8.  Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.